DECEMBER TERM, 1857.                    35

Farmers & Mechanics Bank of Carroll Co., *et al., vs.* Nelson.

*Judgment affirmed.*

( Decided June 2nd, 1858.)

---

# FARMERS AND MECHANICS BANK OF CARROLL COUNTY, AND JACOB MATHIAS, *vs.* BURGESS NELSON.

The board of directors of a bank passed a resolution directing the books for further subscription of stock to the bank to be opened, under the direction of M. and W., "or *either of them,* and that *five dollars be required on each share, at the time of subscribing.*"   N. proposed to subscribe for one hundred shares of stock, provided M. would undertake to raise the money therefor, upon a note for $1000, he then held against certain parties, and not then due.   To this proposition M. agreed, and, in accordance with this agreement, the subscription was made.   HELD:

That, in taking the subscription *in this manner,* M. *exceeded* the authority conferred upon him by the resolution, and there being no proof that his act was ever *ratified* by the bank, N. is not entitled to a decree, compelling the bank to recognise him as a stockholder.

APPEAL from the Equity Side of the Circuit Court for Carroll county.

The bill in this case was filed by the appellee, on the 2nd of April 1853, against the appellants, for the specific performance of an alleged contract of subscription for stock in the Farmers and Mechanics Bank of Carroll county, and for an account of the arrears of dividends thereon, and to compel

Mathias to pay over the proceeds of a certain single bill to the bank, in payment of said stock, and the balance, if any, with interest, to the complainant.

The bill alleges, that on the 14th of October 1850, the bank, by its president and directors, opened books, in Westminster, for subscription of stock therein, a certain portion of its shares, exceeding two hundred, then and still remaining unsubscribed for; that complainant then and there subscribed for one hundred shares of stock, the books for subscription being then open, under the special superintendence of Mathias, the then and still president of the bank, and J. L. Warfield, then and still one of the directors thereof, as the agents of the bank, duly authorised to receive subscriptions for stock as aforesaid; that the transaction of said subscription was as follows: In the first place, complainant proposed to said Mathias and Warfield, in their capacity of agents for the bank, as aforesaid, to subscribe for one hundred shares of stock, provided they, as agents of the bank, and provided the bank, through and by them, as agents, would undertake to raise the money for said stock on a note, under seal, the complainant then held against Ward & Stocksdale, in favor of complainant, for $1000, bearing interest from the 1st of April 1848, dated the 10th of October 1847, and payable the 1st of April 1850. To this proposition Mathias and Warfield, as agents as aforesaid of the bank, and the bank, by its said agents, then and there agreed, and complainant then and there, in compliance with this agreement thus made in writing, which writing is now in possession of the bank, and which it is prayed the bank may be required to produce, subscribed for one hundred shares of stock in said bank, and after said subscription was made, complainant handed to Mathias the aforementioned sealed note, and took a receipt for the same. The bill further alleges, that subsequently complainant received several letters from Mathias, which are filed as exhibits, in which the aforesaid agreement is not only recognised and acknowledged, but the precise terms thereof fully set forth, and, in one of them, Mathias acknowledges that, previous to the 7th of November 1850, he received $60 on the aforesaid note, and placed the same to complain-

ant's said subscription for stock on the books of the bank. It also alleges, that previous to the 5th of June 1851, the whole of said note was paid to Mathias, who has since been requested, by complainant, to appropriate the same to the payment of $10 per share on the stock so as aforesaid subscribed for, that sum being all that the bank has called for on its shares, but that he refuses so to do, and the bank also denies that complainant is, or ever was, a stockholder therein, and refuses to issue to him the usual certificate of stock, and make the usual entries on its books.

The provisions of the *charter* of the bank, (act of 1849, ch. 268, passed the 27th of February 1850,) so far as necessary to be stated, are as follows: The first section provides that the capital stock shall consist of 12,000 shares, of $25 each. The second enacts, that subscription books shall be opened, in Westminster and Uniontown, for 6000 shares in each place, under the direction of certain named *commissioners*, (Jacob Mathias being one, but not Warfield,) "or any *three or more of them*, on the first Monday of May next, and remain open *for two days*." The third provides, "that every subscriber shall pay *to the commissioner*, at the time of subscribing, the sum of *two dollars and a half, in specie*, on each share subscribed for, and the further sum of *two dollars and a half, in specie*, in sixty days thereafter, and the remaining twenty dollars on each share, to be paid at the said bank, as the board of directors may call for." By the fourth section, any stockholder who fails to pay his instalment of $2.50, as above directed, forfeits, for the use of the company, all moneys paid by him antecedent to such failure. The fifth section provides, that the affairs of the bank shall be conducted by a president and ten directors, and that the directors shall be chosen by the stockholders, on the first Monday in June 1850, at Westminster, and yearly thereafter. The eighth section gives power to the board of directors to appoint a president and other officers, and also "to purchase, lease, rent or erect a proper building, in Westminster, for said bank, at the expense of the company." The ninth section forbids the bank to "deal or trade in any thing except bills of exchange, promis-

Farmers & Mechanics Bank of Carroll Co., *et al., vs.* Nelson.

sory notes, United States' stock, stock of the chartered banks, bullion, or the produce of their lands, or of such goods and effects as shall have been pledged or mortgaged to it by way of security, or conveyed to it in satisfaction of debts contracted in the course of its dealing, or purchased at sales upon judgments which shall have been obtained for such debts." The sixteenth section enacts, "that all persons who shall become subscribers to the said bank, their successors and assigns, shall be and are hereby made a corporation and body politic, by the name and style of the Farmers and Mechanics Bank of Carroll county, and by that name shall be and are hereby made able and capable, in law, to sue and be sued," &c., "to make and have a common seal," &c., "to make, issue and negotiate notes, and generally to do and execute such acts, matters and things as to them shall appertain, *under the clauses of this act.*" By the eighteenth section it is enacted, "that upon the payment, as hereinbefore provided, of the first and second instalment, in gold and silver coin, the president and directors *may commence the operations of the bank,* the facts of such payments having been so made, in gold and silver coin, having been first certified to the Treasurer of the State, by such person or persons as he may, upon request of the said president and directors, appoint to examine into, ascertain and report the said facts, but said bank shall *not go into operation* until said payments, in gold and silver coin, shall amount to $30,000, *and such shares as remain unsubscribed for, the president and directors shall dispose of in such manner as they may deem most beneficial to the bank.*"

The *answer* of the bank, under its corporate seal, avers that it was to go into operation as a bank so soon as the provisions of the eighteenth section of its charter was complied with, and not before, and that these provisions were not fully complied with until after the 25th of January 1851, and the bank did not go into actual operation until after that day; that on the 15th of October 1850, the day that Mathias gave the receipt to complainant for the note or single bill for $1000, for collection, the bank had not gone into operation as a bank, and had no power whatever to transact business as a corporation. It

denies that Mathias and Warfield, or either of them, ever were appointed agents for the bank, to dispose of the shares of the stock unsubscribed for, as alleged in the bill. It also positively denies that the complainant ever did subscribe for one hundred or any other number of shares of stock in said bank, and pay for the same, in conformity with the third and fourth sections of its charter, and insists that if Warfield and Mathias, or either of them, ever did make any such contract as that stated in the bill, it is utterly null and void, as in direct violation of the several provisions of said charter. It further denies that Mathias and Warfield, as agents of the bank, ever made such a contract, or that any such contract, in writing, is or ever was in the bank, or the possession of its officers, or that the president and directors ever, in any way, authorised Mathias, as agent, to make any such contract with complainant, or any one else, and if, in fact, he made any such contract, he must have made it as an individual, and on his own account.

The *answer* of Mathias sets up the same defences as to the time the bank went into operation, and as to its power to transact business or make contracts by its president and directors, on the 14th of October 1850. It denies that he, as agent for the bank, ever made any such contract with complainant as that stated in the bill, or that he was ever appointed agent by the bank, to sell and dispose of the shares of stock remaining unsubscribed for at the time the bank went into operation, and avers he never had authority to sell and dispose of any shares of stock, except as one of the commissioners appointed by the second section of the charter, to open books and receive subscriptions, in strict accordance with the provisions thereof. He further states, that he received the note or single bill from the complainant to collect, as agent of the complainant, and not of the bank; that he acted as an individual, and the bank has no concern in the matter, and that he had no authority to act as president of the bank at the time he received the same for collection. He also denies that the complainant ever did subscribe for one hundred shares of stock on the books of the bank, and pay for the same, according to the provisions of the charter, or in any other way. He admits that, at the time he

received this note or single bill for collection, he was anxious that complainant should become a subscriber for one hundred shares of stock in the bank, and to facilitate the collection of the money thereon, agreed to take it for collection, as agent of the complainant, and if the money could be collected before the bank went into actual operation as a corparation, respondent fully intended to have procured the subscription of the complainant for one hundred shares of stock, and to have applied $1000 of the money in payment therefor, but he was unable to collect the money until about the 21st of May 1851, long after the bank went into operation, and when it was impossible to obtain any shares of stock therein, as the books for subscriptions were closed by the commissioners. The answer further states, that as soon as respondent collected the money, he apprised complainant of it, and offered to pay him the same, and has always since been ready and willing so to do.

The *proof*, on the part of the complainant, shows that, agreeably to the charter, the stockholders met, at Westminster, on the 3rd of June 1850, and elected ten directors, Mathias and Warfield being two of them, and that the directors met on the 10th of the same month, and chose Mathias president, and that on the 10th of August following, the board of directors met, Warfield being present, and passed the following resolution:

"*Resolved,* that on Monday and Tuesday, the 14th and 15th days of October, the books for the further subscription of stock to the bank be opened in Westminster and in Uniontown, under the direction of *Jacob Mathias* and *J. L. Warfield,* or *either of them,* at Westminster, and John Roberts and Jno. Smith, of J., or either of them, at Uniontown, *and that five dollars be required on each share, at the time of subscribing. Resolved,* that the foregoing resolution be published in the Carrolltonian and Democrat, county papers; that the *president* is hereby authorised to announce, in connection with the publication of the foregoing resolution, that the bank will go into operation immediately after the first day of January 1851."

In pursuance of this resolution, the publication in the papers was made, headed "*Bank Notice,*" and signed by "Jacob

Mathias, *President.*" The complainant's name appears, with others, as a subscriber for one hundred shares of stock, as of the 14th of October 1850, in a book, (Exhibit *S. B.,) which purports to be a subscription book for stock in the bank, and which the cashier of the bank proves was handed to him by Mathias, *"and is a list of a part of the stockholders."* It was admitted that this list was *twice copied* into *another book in the possession of the bank,* and in each place the name of Burgess Nelson, the complainant, in the *handwriting of Mathias,* appears, with the others, as a subscriber for one hundred shares of stock. On the 19th of April 1851, the board of directors passed a resolution declaring the books for subscription closed, but authorising the president and directors, at their discretion, to dispose of shares of stock, not exceeding five thousand, to such persons as they deem proper.

It was admitted that all the prerequisites of the charter, as conditions precedent to the bank's going into operation, were fully complied with, previous to the 27th of January 1851, and that the bank did, in fact, go into operation, within the meaning of the 18th section of its charter, on that day, and that the number of shares subscribed for at the date of this admission, exclusive of those in controversy in this case, amount to six thousand six hundred. The complainant also offered in evidence a receipt signed by Mathias, dated the 14th of October 1850, acknowledging that he had received the note or single bill of Ward & Stocksdale, for $1000, from the complainant, *"for collection,"* and also the two following letters from Mathias to him, which were also filed as exhibits with the bill:

"WESTMINSTER, 7th November, 1850.
BURGESS NELSON, Esqr.

*My Dear Sir:*—A few days after you left your note with me, I addressed a letter to Mr. Ward, but heard nothing from him until yesterday, when he came, and I am sorry to say that things look rather unfavorably. He says he can't pay the money before next spring, and if your object was to pay your bank stock out of the proceeds of this note, it will produce some disappointment, because we certainly counted on

getting this money.   Mr. Ward paid me sixty dollars on the note, for interest, which I placed to the credit of your stock, on the books of the bank.   He did not appear to be willing to give his note for the balance of the interest, but said he thought he could pay it between now and the first of January. You will be so good as to inform me what order you will take in this matter.

Very respectfully yours, &c.,

JACOB MATHIAS."

"WESTMINSTER, 29th November 1850.

BURGESS NELSON, Esqr.

*Dear Sir:*—I received your letter of the 23rd instant, and am truly sorry to find that you came to the conclusion, after reading my letter, that there was some misunderstanding about your subscription for bank stock.   I think, after you will have read this letter, you will not think so, for the transaction was a very simple and a very fair one.   I will state it as I understood it:   In the first place, you proposed to subscribe for one hundred shares of stock, and handed me a note against Ward & Stocksdale, drawn for $1000, with considerable interest thereon, with the positive understanding that we were to collect the money due on the note, and apply $1000 towards the payment of your stock in the bank, and the balance to be paid to you.   Now, sir, if my letter to you was calculated to convey any other meaning, I did not intend that it should do so, and if the money is not paid just at the time the bank is put in operation, why we must only wait until it is paid, and you can lose nothing by it, for your note will be going on interest. I am very sorry to find, in the concluding part of your letter, that you speak of having no other means to resort to.   Why, my dear sir, nobody dreamed that you should resort to any other means, and I do hope and trust that you will make yourself perfectly easy about this matter, for I am sure all will be right, and when this money is collected, it shall be honestly and faithfully applied according to agreement, and every cent that may be due you, after paying for your stock, shall be paid to you, without one cent of charge.   I again say, I am too sorry to think that this transaction should have given you a

moment's uneasiness, for I am sure all will be right, and I shall, at all times, take pleasure in apprising you of any movement in this matter.

<div style="text-align:center">I am, sir, very respectfully, your ob't servant,</div>

<div style="text-align:right">JACOB MATHIAS."</div>

Jacob Reese, the cashier, the only witness examined in the case, proves, in addition to what has already been stated, that he does not know whether the subscribers, before the commissioners appointed by the charter, paid in specie or in paper; deponent did not pay for his stock until the day the money was counted, the last Saturday in January 1851; a large portion of the cash payments for stock was in bank notes, and a large portion in gold and silver, and all of it was taken to Baltimore, before the bank went into operation, and invested, and when wanted, was drawn and brought to Westminster, and counted; deponent believes the note of Ward & Stocksdale, for $1000, would have been good in Carroll county, on the 14th of October 1850, though he would not have advised the bank to discount it, because he considered them slow pay. On *cross-examination*, this witness proves, that, as cashier, he is the keeper of the books and records of the bank, and that there is nothing in said books and records showing that Jacob Mathias and J. L. Warfield were authorised by the bank to make any such contract as set forth in the bill of complaint in this cause; that Burgess Nelson's name appears upon the memorandum book, S. B., but we have in the bank a correct list of stockholders, in which the name of Burgess Nelson does not appear as a stockholder, and never has appeared as a stockholder in said bank, and he has never, nor has any one else for him, paid any money for stock in said bank, as appears by the books, or to deponent's knowledge.

The court below (NELSON, J.,) passed a decree declaring the agreement set out in the bill a valid one, and decreeing its specific performance as against the bank, and referred the case to the auditor, for an account of the dividends, and also directed Mathias to account for the principal and interest which he has received on the note, and to pay the balance over to the complainant. From this decree the defendants appealed.

The cause was argued before Le Grand, C. J., Eccleston, Tuck and Bartol, J.

*Joseph M. Palmer* for the appellants, argued:

1st. That the court below most manifestly erred in passing a decree for the specific execution of the contract set forth in the bill in this case; for it is an admitted principle in all cases or contracts, both in a court of law and equity, that the *allegata* and *probata* must agree. The contract alleged in the bill, must be admitted by the answers, or proved by the complainant as alleged, before a specific execution can be decreed. 3 *G. & J.*, 153, *Hoye vs. Brewer.* 4 *Md. Rep.*, 459, *Murndorff vs. Kilbourn.* 5 *Md. Rep.*, 18, *Stoddert vs. Bowie.* The answers in this case, so far from admitting, deny most positively the written contract, or any other contract, like the one set forth in the bill. The respondents were called upon to answer the bill, the bank under its corporate seal, and Mathias under oath. The answers both deny the agency and the contract, as charged in the bill, and also that the complainant ever did make a contract with the bank, either in writing or by parol, by its agents or otherwise, in relation to the subscription for shares of stock in the bank, and it is a principle not to be successfully questioned, that the force of an answer responsive to the bill, can only be overcome or avoided by the *contradictory* testimony of two witnesses, or by the testimony of one, supported by pregnant circumstances. 4 *Md. Rep.*, 36, *West vs. Flannagan.* The complainant offered but one witness to sustain the allegations of his bill, the cashier of the bank, whose testimony tends strongly to negative every allegation in it. Indeed, there is not a particle of evidence in the record to overcome the denials of the answers, and there is nothing, therefore, upon which the decree of the court can be sustained—nothing upon which it can rest with legal security.

2nd. But admitting, for the sake of the argument, that Mathias and Warfield, as agents of the bank, did make the agreement, as charged in the bill. Such an agreement was utterly null and void, under the provisions of the *third, ninth*

and *eighteenth* sections of the bank charter. The bank, as a chartered institution, could not be bound by any such contract. The bank, as a corporation, had no existence until long after the making of the pretended contract. The corporation, it is presumed, could hardly make a binding contract before it had a legal existence—before it went into operation, by virtue of the 18th section of its charter. A contract like this, in relation to bartering away shares of its stock for bonds or single bills, is expressly prohibited by the 3rd and 9th sections of the charter. But, besides this, the resolution of the 10th of August 1850, in relation to the opening of books of subscription, required, by its terms, five dollars to be paid on each share *at the time of subscribing*, and neither Mathias nor Warfield had power to exceed to this authority, by making such a contract as this, and without the sanction or subsequent ratification of the bank, of which there is no evidence, it could not bind the corporation.

*Oliver Miller* and *Wm. P. Maulsby* for the appellee:

1st. The first question arising in the case is, whether the contract set out in the bill is sufficiently proved as against the denials of the answers, to authorise a decree for its specific execution. That the contract was, *in fact*, made between Mathias and the complainant, no one who reads the *letters* of the former, filed as exhibits with the bill, can, for a moment, doubt. But it is said, that the denials of the answers can only be overcome by the testimony of *two witnesses*, or of one, with pregnant circumstances. The answer of the *bank* does not put the complainant to this proof, for, being the answer of a corporation, under its corporate seal, it has no other effect as evidence than the answer of an *individual not under oath*. 8 *Gill*, 170, *Md. & N. Y. Coal Co., vs. Wingert.* The answer of Mathias, however, is under oath, and conceding that its denials operate as evidence in favor of his co-defendant, the bank, we still insist that the rule of evidence referred to does not apply to this case. The rule of evidence, that the responsive denials of the answer can only be overcome by the testimony of two witnesses, or of one, with pregnant circum-

stances, is not one of universal application. The rule applies to cases in which the facts denied depend on *oral* testimony, or *oral* and *circumstantial* evidence, and not to cases where the facts are conclusively proved by the *production* of the *written contract* of the parties, or where the defendant has *written letters*, which are exhibited with the bill, stating the contract, and admits these letters to be genuine, though in his answer he denies the contract. The case of *Jones vs. Belt*, 2 *Gill*, 106, fully sustains this view of the rule in question. The letters of Mathias, exhibited with the bill, and proved under the commission, conclusively establish the contract in the *precise terms* in which it is charged in the bill. It may also be remarked, that the answers are evasive, and are filled with *conclusions of law*, as to the effect and construction of the bank charter, rather than direct and positive denials.

2nd. Assuming, then, that the contract is sufficiently proved, the next question is, whether it is *binding upon the bank?* First, it is said the bank did not become a corporation, and had no power to make a contract, until the 27th of January 1851, when the provisions of the 18th section of its charter were complied with. The answer to this objection is, that though they could not *make discounts* and *issue notes* until $30,000, in gold and silver, were, paid in, as provided for in this 18th section of their charter, they could yet *do every other act* and make every other contract which the charter contemplates, as soon as they *accepted* that charter, and this acceptance was made on the *first Monday in June* 1850, as is evidenced by the then subscribers to the stock meeting and electing a *board of directors* and *president*. They then became a corporation, a body *politic*, by virtue of the 16th section of the charter, capable of making contracts, and of suing and being sued. They could elect officers, dispose of the unsubscribed for shares of stock, so as to complete the organization of the bank for *banking purposes*, and make contracts for the "purchase, lease, renting or erecting" a banking house, under the 8th section of the charter; in short, they could do any act, save those of *discounting* and *issuing notes*. *Angel & Ames on Corp.*, 69, 70. Again, it is said this contract violates the *third section* of

the charter, which requires the payment on each share of $2.50 *in specie, at the time of subscribing.* But, by *the terms* of this section, this restriction or requirement applies only to subscriptions taken *before the commissioners* appointed by the 2nd section. These commissioners had power to act *only for two days,* the first Monday and Tuesday in June 1850. Their powers *then ceased,* and all stock not subscribed for then, could only be disposed of under the last clause of the 18th section, which authorises the president and directors to sell and dispose of the shares remaining unsubscribed for *"in such manner as they may deem most beneficial to the bank,"* not requiring the payment of any amount whatever *in specie.* It was under this clause alone that the board of directors had power to pass the *resolution* of the 10th of August, authorising the books for further subscriptions to be opened on the 14th of October following, and it was under this clause and resolution that the subscription in controversy was made. It is, therefore, free from the restriction of *specie payment,* contained in the *third* section. It is true, this resolution requires the payment of *five dollars,* but not in specie, at the time of subscribing, and it is contended that taking the *note* in payment, was an excess of power on the part of *the agents* appointed by this resolution. It must be observed, in considering this objection, that the resolution does not require payment *in specie,* or, indeed, *in money,* and having paid what the agents agreed to receive *in payment,* having satisfied them by paying something else, which the agents agreed to receive as an equivalent for payment in money, the bank cannot be heard in a court of equity to set up this defence. 1 *Md. Ch. Dec.,* 395, *Elysville Manf. Co. vs. Okisko Co.* But even if it was an excess of power, it is still submitted that the bank had *notice of it,* and impliedly ratified the act. Mathias, one of these agents, was the then *president of the bank,* and Warfield, the other, one of *its directors.* The name of Nelson, as a subscriber, appears no less than *three times* upon the books of the bank, and Mathias says, in his letter, that $60 of the money received as interest on the note, was placed to the credit of this subscription for stock on the books of the bank, and there is nothing to show

that the bank ever disavowed the act, until after it had commenced to declare its dividends, which was long after the whole $1000 had been received by Mathias on the note.

It is submitted, therefore, that the case is fully made out, and as there is no technical difficulty in the way of compelling a specific performance, it being admitted that there are over five thousand shares of stock still undisposed of by the bank, that the decree should be affirmed.

Le Grand, C. J., delivered the following dissenting opinion:

The bill filed in this case had for its purpose the passage of a decree compelling the Farmers and Mechanics Bank of Carroll county to make the usual entries on its books, that the complainant was a stockholder of one hundred shares of stock in said bank, and to issue to the complainant the usual certificate to that effect, and to set forth an account of the arrears of dividends on said stock, and to pay said arrears to complainant, and that the defendant, Mathias, be decreed to pay over the proceeds of a certain single bill to the bank, in payment of said stock, and to pay over the balance, if any, together with all just and equitable interest, to the complainant, &c.

The theory of the bill is, that the complainant became a subscriber to the capital stock of the Farmers and Mechanics Bank of Carroll county, to the amount of one hundred shares, and that this subscription was made through the agency of the defendant, Mathias, the then president of the bank, and Jesse L. Warfield, then one of the directors thereof. The bill states the transaction of the alleged subscription to have been as follows: The complainant proposed to the said Mathias and Warfield, in their capacity of agents to the said bank, to subscribe for one hundred shares of stock, provided Mathias and Warfield, as agents of the bank, and provided the bank, through and by their said agents, would undertake to raise the money for said stock on a note the complainant then held against Jno. T. Ward and Solomon Stocksdale, under seal, in favor of complainant, for $1000, bearing interest from the first day of April 1848, bearing date the 10th day of October 1847, and payable the 1st day of April 1850; that Mathias and Warfield, as agents

Farmers & Mechanics Bank of Carroll Co., *et al.*, *vs.* Nelson.

of the bank, and the bank, by their said agents, agreed to this proposition, and, in compliance with this agreement, the subscription was made. The bank answered the bill, denying that the complainant was a subscriber, averring that the bank did not go into operation as a bank, with banking powers, until after the 25th day of January 1851; and, also, that Warfield and Mathias "never were, neither was either of them, appointed agents for the defendant, to dispose of the shares of stock unsubscribed for, as alleged by the complainant, in his said bill of complaint; but this defendant admits that the said Jesse D. Warfield and Jacob Mathias were commissioners appointed under and by virtue of the second section of said charter, with power, together with others, to open books of subscription for six thousand shares of stock in said bank, and that they, together with others, did open books of subscription at sundry times and places, as provided for in said second section of said charter, but this defendant positively denies that the said complainant, Burgess Nelson, ever did subscribe for one hundred shares of stock in said bank, or any other number of shares, and pay for the same in conformity with the third and fourth sections of said bank charter." The answer then proceeds to state several legal conclusions drawn from its construction of the provision of its charter, and then denies that it ever "in any way authorized Jacob Mathias, as agent, to make any contract or agreement with the complainant, or any one else, like the one set forth and charged in the bill."

The defendant, Mathias, denies positively that he ever made, as agent of the bank, any such contract as that set out in the bill of complaint, and also that the complainant is a stockholder in the bank.

These denials are sufficiently full to put the complainant to the proof of his case.

The answer of the bank, under its corporate seal, establishes nothing more than a denial of the allegations of the bill, it being only equivalent to the answer of an individual, not sworn to. 8 *Gill*, 170, *Md. & N. Y. Coal Co.*, *vs. Wingert.* The answer of Mathias, although it emphatically denies the agreement and subscription alleged in the bill, is not such a denial,

7    v. 12.

under the circumstances of this case, as to require two witnesses, or one, with strong pregnant circumstances, to overcome it. Although the rule, in the general, appertains to the denial of the defendant, there is, nevertheless, a class of cases wherein it is not observed, and this, in my judgment, is such a one.

In the case of *Jones vs. Belt*, 2 *Gill*, 106, the court held, that where a complainant alleged the existence of a contract with the defendant, accompanied with collateral circumstances, and called upon him not to state what the contract was, but to admit or deny the existence of the agreement and circumstances set forth, and the defendant, in his answer, averred another agreement, and denied the collateral circumstances, the statement of the agreement by the defendant in such case is not *simply* responsive to the contract he was called on to admit or deny. It is not such a denial as requires two witnesses, or one, with concurring circumstances, to disapprove it; nor, in this case, was it necessary to disprove the denial of the collateral circumstances by the same amount of proof. And although, as was decided in *Powles, et al., vs. Dilley*, 9 *Gill*, 222, where a complainant calls upon a defendant to answer, he makes the latter a witness, and so far as the answer is responsive to the bill, it must be received against the complainant, and it cannot be excluded, because there is a co-defendant in whose favor it may and does consequentially operate; yet, in a case like this, the principle recognized in *Jones vs. Belt*, 2 *Gill*, 106, is not affected, but remains in full force. Here the answer of the bank merely puts the complainant to the proof of his case; and although the answer of the defendant, Mathias, under oath, is, so far as it is responsive to the bill, available to the bank, yet it is liable to be contradicted by proof of the contract, which proof may consist solely of its production and identification.

Keeping these principles in view, we are to inquire—1st, whether there was such a contract as that sought to be enforced? and 2nd, whether it was such a contract as it was competent to the bank to make, in the manner and under the circumstances detailed? These questions are to be answered

by the evidence in the cause, and the terms of the act of incorporation.

There is no doubt that, to entitle a party to a decree for specific performance, his proof must correspond to the contract alleged. What, then, is the contract alleged in this case? It is, in substance, this: the complainant claims to be a subscriber to the capital stock of the bank, to the amount of one hundred shares, and that he made that subscription under the superintendence of the authorized agents of the bank, and that he made the stipulated payments by handing to one of those agents a single bill, which he agreed to collect and appropriate accordingly, and that he was returned as a subscriber to the number of one hundred shares. This contract is denied by the defendant, Mathias, and the question is, is the contract alleged by the complainant made out by the proof? I think it is.

I assume, for the present, that Mathias was the agent of the bank, and, if so, his acts, within the line of his agency, bind the bank. In his letter of the 20th of November 1850, addressed to the complainant, he says: "*You* (the complainant) *then subscribed for one hundred shares of stock, and handed me a note against Ward and Stocksdale, drawn for $1000, with considerable interest thereon, with the positive understanding that we were to collect the money due on the note, and apply $1000 towards the payment of your stock in the bank, and the balance paid to you.*" Again, in the same letter, in allusion to some apprehension expressed by the complainant, he says: "I do hope and trust that you will make yourself perfectly easy about this matter, for I am sure all will be right, *and when this money is collected, it shall be honestly and faithfully applied, according to agreement, and every cent that may be due you, after paying for your stock, shall be paid to you, without one cent of charge.*"

Jacob Reese testifies that exhibit S. B. was handed to him by the defendant, Mathias, and, by it, it appears Burgess Nelson is a subscriber to the amount of one hundred shares. It also appears, by the testimony of Mr. Reese, that in a book belonging to the bank, it appears, *in the handwriting of Mr. Mathias*, that Mr. Nelson, the complainant, was a subscriber

for one hundred shares. If these acts were a legitimate exercise of authority on the part of Mr. Mathias, then it is clear Nelson was a subscriber.

By the minutes of proceedings of the bank, it appears that, on the 10th day of August 1850, the books for the further subscription of stock to the bank were authorized to be opened in Westminster and in Uniontown, under the direction of Jacob Mathias and J. L. Warfield, or either of them, at Westminster, &c.

It is under this resolution the complainant claims he has a right to regard Mathias as the agent of the bank to take subscriptions, and I think he is correct in his opinion. The 18th section of the act of incorporation expressly provides, that if there shall be any of the shares of the stock undisposed of and *"unsubscribed for*, the president and directors shall dispose of the same *in such manner as they may deem most beneficial for the bank.*" The authority given to commissioners, by the second section of the act, to receive subscriptions, has nothing to do with the case. The power conferred by it was to be exercised in the month of May 1850, and to exhaust itself in two days, the language being, they were to receive subscriptions "on the first Monday of May next, and remain open for two days." And, in the case of *Plank Road Co. vs. Hoffman*, 9 *Md. Rep.*, 568, this court said: "Commissioners are appointed to receive subscriptions to stock for the purpose of giving the subscribers a right to organize as a corporation under a charter. So soon, however, as the organization takes place, the authority of the commissioners ceases, and all corporate powers conferred by the charter, vest in the body politic. Such, at least, is the general rule applying in every case where there is no special provision to the contrary." It appears, by the agreement signed by the counsel for the complainant, and Mathias, as president of the bank, "that all the requisites of the charter, as conditions precedent to the bank's going into operation, and the president and directors commencing operations of the bank, were fully complied with previous to the 27th day of January 1851; and that the bank did, in fact, go into operation, within the meaning of the 18th section of the charter, on that day."

It is contended by the defendants, that until after the 27th day of January 1851, the bank had no right to do any business, whatever, under its charter. This is obviously error. What is meant by the requirements of the 18th section, in this regard, is, that the corporation shall not be permitted to avail itself of *the franchise of banking,* in the manner pointed out by its charter, until it shall have first complied with them. It had, as a corporation, full power to do all acts preliminarily necessary to put the bank in operation, such as receiving subscriptions, providing suitable buildings, &c. It is to be presumed that when the Legislature passed the act of incorporation, it designed the bank should go into operation. Now, by the second section of the act, the commissioners therein designated had but two days allotted to them wherein to receive subscriptions, and, if the view advanced on behalf of the defendants were tenable, and the necessary amount of stock was not subscribed within those two days, the act would, in point of fact, be of no avail. The 18th section guards against such a state of things from mere abundance of caution, giving to the corporation the power to dispose of the unsubscribed shares *"in such manner as they may deem most beneficial for the bank."* This power the corporation rightfully exercised in the passage of its resolution of the 10th of August 1851, and, inasmuch as it constituted the defendant, Mathias, its agent to receive subscriptions, his acts, in this regard, bind it.

I think, with all deference to others, that no one who reads the record in this case, ought to have a doubt that it was understood between Mathias and Nelson that he was a subscriber for one hundred shares. Indeed, the defence set up to the claim of the complainant is principally, if not entirely, technical. I discover no equity whatever in it, and, believing the complainant to have made out his case fully, am of opinion that the decree of the Circuit Court should be affirmed.

ECCLESTON, J., delivered the opinion of this court.

We are of opinion that the complainant in this case is not entitled to the relief which he seeks. Were it conceded that the corporation had the right to pass the resolutions of the 10th

of August 1850, authorizing Messrs. Mathias and Warfield, or either of them, to receive additional subscriptions, in taking that of the complainant in the manner they did, they exceeded the authority conferred upon them, and there is no proof their act was ever ratified by the bank.

<div align="center">

*Decree reversed and bill dismissed,*

*each party to pay his own costs.*